1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SERGIO MARCOS MIRANDA,               )   No. C 12-02483 EJD (PR)
                                                          )
                        Petitioner,              )   **ORDER DENYING PETITION FOR**
                                                          )   **WRIT OF HABEAS CORPUS;**
         v.                                           )   **DENYING CERTIFICATE OF**
                                                          )   **APPEALABILITY**
                                                          )
TIM VIRGA, Warden,                          )
                                                          )
                        Respondent.          )
                                                          )
                                                          )
_____ )

Petitioner has filed a <u>pro se</u> petition for a writ of habeas corpus under 28

U.S.C. § 2254 challenging his state conviction from Solano County Superior Court.

For the reasons set forth below, the Petition for a Writ of Habeas Corpus is

**DENIED**.

**BACKGROUND**

Petitioner and his co-defendant, Dennis Derrick, were found guilty by a jury

of two counts of first degree murder and three counts of attempted murder, plus

special circumstances.  On August 6, 2009, the trial court sentenced Petitioner to two

consecutive sentences of life without parole plus 25 years to life for each of the two

murders and related enhancements; three consecutive sentences of life with the

possibility of parole plus 25 years to life for each count of attempted murder and

related enhancements; and five years for weapon possession by a felon.  The

California Court of Appeal affirmed.  The California Supreme Court denied review.

Petitioner filed the instant federal habeas petition on May 16, 2012.

**FACTUAL BACKGROUND**

The following facts are taken from the opinion of the California Court of Appeal:

> About 10:00 p.m. on May 30, 2006, Soares, Benjamin, Jose, and Clay decided to walk Clay's girlfriend, Vidrio, to her home on Dover in Fairfield.  They walked side by side so they could converse.  According to Soares, as they approached the intersection of San Diego and San Marcos Streets, a gold Chevy Impala drove slowly, about 20 feet behind them.  The car then approached the group and the driver, later identified as Derrick, asked if they were "busters."  [FN4]  Jose said "No."  The car then pulled about six feet in front of the group and stopped.  The car's front seat male passenger, later identified as Miranda, exited the car, wearing a black hooded sweatshirt.  Miranda was four or five feet from Soares and Jose; Craig, Vidrio and Benjamin were a couple of steps in front of Soares.  Miranda raised his arm, aimed at Benjamin and fired a shot.  Soares saw the gun's muzzle "blasting off" and Benjamin get shot.  [FN5]  After hearing the first shot, Soares ran about five or six houses away from the scene.  He then heard two more shots.  When he heard the car's tires screech and the car drive off, he went back to the shooting scene.  Soares saw Benjamin, Jose, and Craig lying on the ground and Vidrio hiding behind a tree.

> FN4. The prosecution's gang expert testified that "buster" is a derogatory term used against Norteños.

> FN5. On cross-examination Soares said he never saw the gun pointed directly at him and did not hear any shots "come toward [him] in [his] direction."  He testified, "I could say it was aimed at all of us, we were all in the same area."

> According to Clay and Vidrio, when the car approached, Derrick asked if the group were Norteños and busters.  When Derrick asked, "Where are you from?" Jose responded, "Fairfield."  The driver also said, "CSM on mines." [FN6]  The car then pulled ahead one or two houses and stopped; the group kept walking.  Miranda exited the car, walked toward the group, raised his arm and fired three shots. [FN7]  Clay said Miranda wore a black glove on one hand.  Clay saw Miranda raise the gun and shoot Benjamin in the chest; Benjamin fell to the ground.  Clay then ran toward the tree where Vidrio was hiding.  As Clay did so, he realized he, too, had been shot.

> FN6. According to the gang expert this meant the driver was claiming his gang allegiance.

> FN7. On cross-examination Clay said Miranda raised his right arm and pointed it in the direction of the group and fired.  He

United States District Court

For the Northern District of California

also said the gun was pointed to the left of him, where Benjamin was standing.

According to Vidrio, after exiting the front passenger door, Miranda moved to the back of the car.  He wore black gloves and held a gun in his left hand.  Vidrio saw Miranda raise the gun and fire once.  After she saw Benjamin fall, Vidrio ran behind the tree and then heard two more shots.

Soares called police from the crime scene.  In a tape of the call played at trial, Soares said "some random car full of Mexicans, . . . came up . . . [¶] . . . and they shot . . . at us."

Benjamin was pronounced dead at the scene from a gunshot wound to the chest.  Jose suffered a gunshot wound to his lower thoracic region and died the next morning.  Clay was shot in the right thigh and the bullet's trajectory caused severe injury to his right testis, necessitating its removal.

After hearing gunshots, Fairfield Police Officer Franco Cesar drove toward the location from where the shots were fired.  He saw a Chevy Impala at the intersection of Dover and San Marcos and pursued it, joined by other officers.  A high speed freeway chase ensued, ending in Vacaville, when the car crashed into a guardrail after hitting an officer deployed spike strip.  Appellants were removed from the car.

A navy and black sports left-handed glove was found between the car's front passenger seat and the console.  A DNA test of the inside of the glove matched Derrick's DNA.  A gun cleaning kit was found inside the car's trunk.  A .44-magnum revolver and a right-handed athletic glove were found in the area where police had seen the car swerve.  The gun had one empty chamber, three expended casings and two unfired bullets.  Police found two bullets at the shooting scene, and a third bullet was removed from Jose.  The two bullets found at the scene were fired by the recovered revolver.

The prosecution's gang expert, Fairfield Police Detective Steven Garcia, testified that at the time of the shootings appellants were members of CSM, a Sureño gang also known as Calle San Marcos, and the shooting scene was considered CSM territory.

The thrust of Miranda's defense was that, although he was in the front passenger seat of the car and was either a gang member or gang associate, he was not the shooter.  The thrust of Derrick's defense was that although he was the driver of the car, he was not the shooter and did not aid and abet the shootings.

People v. Miranda, No. A125869, slip op. at 3-5 (Cal. Ct. App. May 12, 2011) (Ans. Ex. G).

**DISCUSSION**

I.      Standard of Review

3

1      This Court may entertain a petition for a writ of habeas corpus "in behalf of a

2  person in custody pursuant to the judgment of a State court only on the ground that

3  he is in custody in violation of the Constitution or laws or treaties of the United

4  States." 28 U.S.C. § 2254(a).  The writ may not be granted with respect to any claim

5  that was adjudicated on the merits in state court unless the state court's adjudication

6  of the claim:  "(1) resulted in a decision that was contrary to, or involved an

7  unreasonable application of, clearly established Federal law, as determined by the

8  Supreme Court of the United States; or (2) resulted in a decision that was based on an

9  unreasonable determination of the facts in light of the evidence presented in the State

10  court proceeding." 28 U.S.C. § 2254(d).

11      "Under the 'contrary to' clause, a federal habeas court may grant the writ if

12  the state court arrives at a conclusion opposite to that reached by [the Supreme] Court

13  on a question of law or if the state court decides a case differently than [the] Court

14  has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362,

15  412-13 (2000).  The only definitive source of clearly established federal law under 28

16  U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as

17  of the time of the state court decision. Williams, 529 U.S. at 412.  While circuit law

18  may be "persuasive authority" for purposes of determining whether a state court

19  decision is an unreasonable application of Supreme Court precedent, only the

20  Supreme Court's holdings are binding on the state courts and only those holdings

21  need be "reasonably" applied. Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.),

22  overruled on other grounds by Lockyer v. Andrade, 538 U.S. 63 (2003).

23      "Under the 'unreasonable application' clause, a federal habeas court may grant

24  the writ if the state court identifies the correct governing legal principle from [the

25  Supreme Court's] decisions but unreasonably applies that principle to the facts of the

26  prisoner's case." Williams, 529 U.S. at 413.  "Under § 2254(d)(1)'s 'unreasonable

27  application' clause, . . . a federal habeas court may not issue the writ simply because

28  that court concludes in its independent judgment that the relevant state-court decision

4

applied clearly established federal law erroneously or incorrectly." <u>Williams</u>, 529

U.S. at 411.  A federal habeas court making the "unreasonable application" inquiry

should ask whether the state court's application of clearly established federal law was

"objectively unreasonable." <u>Id.</u> at 409.  The federal habeas court must presume

correct any determination of a factual issue made by a state court unless the petitioner

rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. §

2254(e)(1).

The state court decision to which Section 2254(d) applies is the "last reasoned

decision" of the state court.  <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803-04 (1991).

When there is no reasoned opinion from the highest state court considering a

petitioner's claims, the court "looks through" to the last reasoned opinion.  <u>See</u> <u>id.</u> at

805.  Here, that opinion is from the California Court of Appeal.

II.     <u>Claims and Analysis</u>

As grounds for federal habeas relief, Petitioner raises the following claims: (1)

there was insufficient evidence to support the attempted murder convictions for two

of the victims; (2) the jury was improperly instructed on the "kill zone" theory of

liability; and (3) Petitioner's joint trial was rendered fundamentally unfair by the

admission into evidence of prejudicial letter written by his co-defendant, Derrick.

A.     <u>Sufficiency of the evidence</u>

 Petitioner claims that his convictions for the attempted murder of Soares and

Vidrio are unsupported because there was no evidence that Petitioner ever aimed at

either victim, nor had he indicated an intent to kill either victim.

The Court of Appeal summarized this claim raised on direct appeal:

Appellants contend there was insufficient evidence to support
their convictions of attempted murder of Vidrio and Soares under
both a traditional theory and a kill zone theory of liability.  The
People concede there was insufficient evidence to support the kill
zone theory, but assert that there was sufficient evidence to support
the traditional theory of attempted murder.

"'The proper test for determining a claim of insufficiency of
evidence in a criminal case is whether, on the entire record, a rational

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]' [Citation.]" (People v. Perez (2010) 50 Cal. 4th 222, 229 (Perez).)

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. [Citation.]" (People v. Ervine (2009) 47 Cal. 4th 745, 785 (Ervine).) Since attempted murder requires the specific intent to kill, the defendant's ""'[g]uilt of attempted murder must be judged separately as to each alleged victim.'" [Citation.]" (Perez, supra, 50 Cal. 4th at p. 230.)

Here, in order for appellants to be convicted of the attempted murders of Vidrio and Soares, the prosecution had to prove appellants acted with the specific intent to kill each of them, regardless of whether Vidrio and Soares were specifically targeted or randomly chosen. (Perez, supra, 50 Cal. 4th at p. 230.) There is usually no direct evidence of a defendant's intent. (People. v. Lashley (1991) 1 Cal. App. 4th 938, 945-946.) "[I]ntent to kill or express malice . . . may in many cases be inferred from the defendant's acts and the circumstances of the crime. [Citation.] '. . . The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill. . . ." [Citation.]' [Citations.] '"The fact that the shooter may have fired only once and then abandoned his efforts out of necessity or fear does not compel the conclusion that he lacked the animus to kill in the first instance. Nor does the fact that the victim may have escaped death because of the shooter's poor marksmanship necessarily establish a less culpable state of mind." [Citation.]' [Citation.]" (People v. Smith (2005) 37 Cal. 4th 733, 741.)

"Whether the defendant attempted to murder more than one individual in the group he fired upon turns on whether the evidence establishes that he acted with specific intent to kill that additional person or persons." (Perez, supra, 50 Cal. 4th at p. 231, fn.5.)

Appellants argue there is no evidence that they specifically intended to kill or tried to shoot all five members of the group. In support of their argument, they assert the shooter used a gun that was single action; it had to be cocked before each trigger pull; although there were five bullets in the gun, only three shots were fired; and appellants did not announce an intent to kill all five group members.

Appellants rely on the Supreme Court's recent opinion in Perez. In that case, the defendant fired a single bullet at a distance of 60 feet, from a car travelling 10 to 15 miles per hour, at a group of seven peace officers and a civilian who were standing less than 15 feet apart from one another. There was evidence that the defendant believed he was shooting at a group of rival gang members, but no evidence he was targeting any particular individual when he fired at the group. [FN8] The bullet wounded one officer. The jury

convicted the defendant of seven counts of premeditated attempted murder of a peace officer and one count of premeditated attempted murder of the civilian victim.  The Court of Appeal affirmed the eight counts of attempted murder, reasoning that the jury could find that "'the officers' proximity to each other was such that in intending to kill any of the officers defendant's shooting endangered the lives of all.'"  (Perez, supra, 50 Cal. 4th at p. 224.)  The Supreme Court, reversed, concluding the evidence was sufficient to establish only one count of premeditated attempted murder of a peace officer.  It concluded the evidence established the shooter indiscriminately fired a single shot at a group of persons with the specific intent to kill someone, but without targeting any particular individual or individuals.  (Id. at p. 225.)  It concluded there was no evidence that the defendant specifically targeted any particular individual or individuals in the group fired upon, no evidence he specifically intended to kill two or more persons with the single shot, and no evidence he specifically intended to kill two or more persons in the group, but was thwarted from firing off additional shots by circumstances beyond his control.  (Id. at pp. 230-231.)

> FN8.  The prosecutor in Perez argued to the jury that the evidence established the defendant did not intend to kill everyone in the group and did not have "'a specific target in mind': when he fired into the group.  (Perez, supra, 50 Cal. 4th at p. 225.)

We conclude Perez is factually distinguishable from the instant case.  Here, Miranda fired three shots at the group from close range – a distance of four to five feet – giving rise to the inference that he intended to kill all of them.  As argued by the prosecutor, Derrick's hostile comments just prior to the shooting were directed at the whole group, and there were five bullets in the gun and five potential victims.  Based on this evidence the jury could reasonably have concluded that the intent to kill all five members of the group was interrupted after the first shot was fired when Jose, Clay, Vidrio and Soares ran, preventing Miranda from shooting at Vidrio and Soares.  We conclude substantial evidence supports the convictions of attempted murder of Vidrio and Soares under a traditional theory of attempted murder liability.

(Ans. Ex. G at 5-7.)

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  The Supreme Court has emphasized that sufficiency of the evidence types of "claims face a high bar in federal habeas proceedings . . ."  Coleman v. Johnson, 132 S. Ct. 2060, 2062 (2012) (per curiam) (finding that the Third Circuit "unduly impinged on the jury's role as factfinder" and failed to apply the deferential standard of Jackson [v. Virginia, 443

U.S. 307, 321 (1979)] when it engaged in "fine-grained factual parsing" to find that the evidence was insufficient to support petitioner's conviction).  A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt.  Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992); see, e.g., Coleman, 132 S. Ct. at 2065 ("the only question under Jackson is whether [the jury's finding of guilt] was so insupportable as to fall below the threshold of bare rationality").  The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  Payne, 982 F.2d at 338 (quoting Jackson, 443 U.S. at 319).  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, has there been a due process violation.  Jackson, 443 U.S. at 324.

The state court's rejection of this claim was not unreasonable.  The evidence showed that Soares and Vidrio ran after they heard the first shot.  Clay also ran, but was shot before he was able to hide behind a tree.  While there was evidence that Petitioner and his co-defendant believed all five victims to be members of a rival gang, there was no evidence to show that either Petitioner or his co-defendant had any particular motive to kill one victim over another.  Viewing the evidence in the light most favorable to Respondent, it was reasonable for the state court to conclude that Petitioner had the ability to fire all five bullets and only neglected to fire at Soares and Vidrio because he did not know to where they escaped.  On this record, the state courts' rejection of this claim was not objectively unreasonable.  28 U.S.C. § 2254(d)(1).

B.    "Kill zone" jury instruction

Petitioner's second claim is that the trial court's instruction on the "kill zone" was ambiguous, and allowed the jury to convict him of the attempted murders of Soares and Vidrio under this theory as long as the jury concluded that Petitioner

intended to kill or harm either Benjamin, Jose, or Clay.  Petitioner states that a correct instruction would have directed that Petitioner could be found guilty of attempted murder under the "kill zone" theory only if he intended to kill everyone within the kill zone.  Petitioner relies on the fact that the instruction given in his case was later disapproved by the California Supreme Court in People v. Stone, 46 Cal. 4th 131, 138 (2009).

On appeal, the State conceded, and the appellate court agreed, that there was not substantial evidence to support the "kill zone" theory.  The Court of Appeal discussed the "kill zone" theory, and recognized that the state supreme court had stated that the theory "does not apply where there is no evidence that the defendant used a means to kill that inevitably would result in the death of other victims within a zone of danger."  (Ans. Ex. G at 9.)  However, the State argued that CALCRIM No. 600[1] was correctly stated as given, and the error of instructing the jury with CALCRIM No. 600 was not prejudicial.  The state appellate court agreed that the ambiguities in the instruction, as given, did not render the instruction incorrect as a jury could understand the correct meaning when considering the instruction in context.  (Id. at 10.)

The Court of Appeal further agreed that giving CALCRIM No. 600 to the jury was not prejudicial:

> We next must determine whether the error in instructing the jury regarding the kill zone theory of liability for attempted murder was prejudicial. (See Stone, supra, 46 Cal. 4th at pp. 138-139 [error in giving kill zone theory instruction which did not fit facts of case not necessarily prejudicial].)

---

[1] In relevant part, the Court gave the jury the following portion of CALCRIM No. 600:  "A person may intend to kill a specific victim or victims and at the same time intend to kill anyone in a particular zone of harm or 'kill zone.'  In order to convict the defendant of the attempted murder of [Vidrio or Soares], the People must prove that the defendant not only intended to kill [Benjamin, Jose or Clay], but also either intended to kill [Vidrio or Soares], or intended to kill anyone within the kill zone.  If you have a reasonable doubt whether the defendant intended to kill [Vidrio or Soares], or intended to kill [Benjamin, Jose or Clay], by harming everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of [Vidrio or Soares]."  (Emphasis added.)

9

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

"It is error to give an instruction which, while correctly stating a principle of law, has no application to facts of the case." (People v. Guiton  (1993) 4 Cal.4th 1116, 1129 (Guiton).)  Such an error requires reversal only if "it is reasonably probable the result would have been more favorable to the defendant had the error not occurred.  [Citation.]"  (Id. at p. 1130.)  "[G]iving an irrelevant or inapplicable instruction is generally '"only a technical error which does not constitute ground for reversal."'  [Citation.]"  (People v. Cross (2008) 45 Cal. 4th 58, 67.)  "In determining whether there was prejudice, the entire record should be examined, including the facts and the instructions, the arguments of counsel, any communications from the jury during deliberations, and the entire verdict.  [Citation.] Furthermore, instruction on an unsupported theory is prejudicial only if that theory became the sole basis of the verdict of guilt; if the jury based its verdict on the valid ground, or on both the valid and the invalid ground, there would be no prejudice, for there would be a valid basis for the verdict. . . .  [T]he appellate court should affirm the judgment unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory."  (Guiton, at p. 1130; accord, People v. Perez (2005) 35 Cal. 4th 1219, 1233.)

12

13

14

The thrust of Miranda's closing argument was that the prosecution failed to establish his liability as the shooter or as an aider and abettor.  The thrust of Derrick's closing argument was that the prosecution failed to establish his liability as an aider abettor by failing to show the gun was his and he knew the shooter had a gun and was going to shoot the victims.

15

16

17

In her closing argument, the prosecutor first argued that appellants were guilty of the attempted murders of Clay, Vidrio and Soares under a traditional theory of attempted murder.  After arguing that Miranda intended to kill all five victims, she stated:

18

19

20

"The jury instruction tells you a person who attempts to commit murder is guilty of attempted murder even if after taking a direct step toward killing he abandons further efforts to complete the crime or his attempt fails or is interrupted by someone or something beyond his control.

21

22

23

"That's what you have in this case. Whether he decided it was taking too long, but we know he had to pull the hammer back each time to fire again or because the victims ran, his plan was interrupted.  But his intent when he got out of that car was to kill all five of those victims.

24

25

"There is more than enough evidence to find the defendants guilty of the attempted murders of all three of these victims on the theory that we just discussed.

26

27

28

"But as the [c]ourt instructed you, there is an alternative theory for attempted murder, and it is called the kill zone.  The person may intend to kill a specific person or victim or victims and at the same time intend to kill anyone in a particular zone of harm or in a kill zone.

"So in other words, when he goes up and he fires this gun, we know these victims are standing close together. We know these bullets go through items. The bullets went through two of the victims and continued on. We know those bullets bounced off of objects. You will see in the photographs one of the bullets hit . . . in front of [the] house [on] San Diego and bounced off and landed in the grass.

"If the defendant intended to kill everyone there by killing one or two, then you can still find them guilty of the attempted murder.

"It's a little confusing, but I think if you focus on the instructions, you will understand that.

"An example would be if someone wanted to kill a person and they were in a car with four other people. If they just opened fire on the car because it's, you know, I don't know these people, and I don't really want to kill them, but I want to kill that guy. And I want to make sure I kill him. So I will kill everybody in the car to make sure I get that guy. That's the kill zone.

"The defendants in the case created a kill zone by their actions, by the type of [weapon] they used, by the way they fired the weapon in a reckless manner, the fact that these other victims are so close by and running away. Under either theory both defendants are guilty of the attempts to murder all three of these victims."

During deliberations the jury sent a note to the court asking, "What is [the] definition of kill zone?" The court responded, "Please refer to [CALCRIM No.] 600 which is the instruction that addresses kill zone. That is a matter for you to decide." Thereafter, the jury asked no follow-up questions. "[A] jury is presumed to understand a judge's answer to its question. [Citation.]" (<u>Weeks v. Angelone</u> (2000) 528 U.S. 225, 234.)

Considering the instructions as a whole, the evidence presented at trial, and the arguments of counsel, we conclude it is not reasonably likely that the jury convicted appellants of the attempted murders of Vidrio and Soares based upon the kill zone theory. The jury was instructed that some instructions might not apply to the facts they found to be true, and we assume they followed that instruction. (<u>People v. Benson</u> (1990) 52 Cal. 3d 754, 793.) Given the absence of evidence to support the kill zone theory, it is unlikely the jury utilized that theory to convict. There was, however, sufficient evidence establishing appellants' specific intent to kill Vidrio and Soares, as well as Clay, Jose and Benjamin, under a traditional attempted murder theory. Although the prosecutor argued the alternative kill zone theory, she clearly argued that appellants intended to kill each of the five victims. In addition, the kill zone instruction did not undermine Miranda's defense that he was not the shooter and Derrick's defense that he was neither the shooter nor an aider and abettor to the shooting. And nothing in the record establishes the jury relied on the kill zone theory. Because there is not "an affirmative indication in the record" that the jury based its

United States District Court

For the Northern District of California

1   verdict on the kill zone theory, the error in instructing on the kill
    zone theory is harmless. (Guiton, supra, 4 Cal. 4th at pp. 1128-
2   1129.)

3   (Ans. Ex. G at 11-14.)

4          To obtain federal collateral relief for errors in the jury charge, a petitioner

5   must show that the ailing instruction by itself so infected the entire trial that the

6   resulting conviction violates due process. See Estelle v. McGuire, 502 U.S. 62, 78

7   (1991). The challenged instruction may not be judged in artificial isolation, but must

8   be considered in the context of the instructions as a whole and the trial record. See

9   id. at 72. In other words, the Court must evaluate jury instructions in the context of

10  the overall charge to the jury as a component of the entire trial process. United

11  States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145,

12  154 (1977)). The relevant inquiry is "whether there is a reasonable likelihood that

13  the jury has applied the challenged instruction in a manner that prevents the

14  consideration of constitutionally relevant evidence." Boyde v. California, 494 U.S.

15  370, 380 (1990).

16         As an initial matter, the state court ruled that the kill zone instruction

17  adequately sets forth California law regarding the offense; that decision is binding

18  on this Court. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005). Further, here, it is

19  not reasonably likely that the jury applied the instruction in a way that violated the

20  Constitution. The jury was instructed as to the elements of attempted murder,

21  including specific intent; it was instructed that it could not convict Petitioner under a

22  "kill zone" theory unless it found that Petitioner intended to harm everyone in the

23  zone; and it was reminded that it was to follow the law as instructed by the Court.

24  The jury is deemed to have followed these instructions, see Weeks v. Angelone, 528

25  U.S. 225, 234 (2000), and when considering the jury instructions in the context of

26  the whole trial rather than in artificial isolation, the jury instructions did not violate

27  Petitioner's due process rights. See Estelle, 502 U.S. at 72.

28         Moreover, even if the instruction as given was erroneous, there was no

United States District Court
For the Northern District of California

prejudice.  In order to show a due process violation, the defendant must show both ambiguity and a "reasonable likelihood" that the jury applied the instruction in a way that violates the Constitution, such as relieving the state of its burden of proving every element beyond a reasonable doubt.  Waddington v. Sarausad, 555 U.S. 179, 190-191 (2009) (internal quotations and citations omitted).  A determination that there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution establishes only that an error has occurred.  See Calderon v. Coleman, 525 U.S. 141, 146 (1998).  If an error is found, the Court also must then determine that the error had a substantial and injurious effect or influence in determining the jury's verdict, see Brecht v. Abrahamson, 507 U.S. 619, 637 (1993), before granting relief in habeas proceedings.  See Calderon, 525 U.S. at 146-47.

Here, the record shows that the state appellate court found that there was no reasonable likelihood that the jury applied the instruction in a way that violated the Constitution.  Even in Stone, the case Petitioner relies upon to support his argument, the state supreme court recognized that the use of "anyone" rather than "everyone" within the context of the instruction was probably interpreted as meaning "the intent to kill any person who happens to be in the kill zone, i.e., everyone in the kill zone." Stone, 46 Cal. 4th at 138 n.3 (emphasis in original).  Thus, it was not objectively unreasonable for the state court to conclude that it was not reasonably likely that the jury interpreted the instruction in a prohibited manner.

Moreover, even assuming there was error, it did not have a substantial or injurious effect or influence in determining the jury's verdict.  The prosecutor argued that Petitioner was guilty of attempted murder under the traditional theory, and then, in the alternative, argued that Petitioner was guilty under the "kill zone" theory.  (Ans. Ex. G at 12-13.)  The prosecutor explained the "kill zone" theory correctly.  (Id.)  Further, the defense argued that Petitioner was neither the shooter nor an aider and abettor, thus the error did not affect the defense theory of the case.

United States District Court
For the Northern District of California

Finally, the evidence supports a finding that Petitioner intended to kill each of the five victims.  Given the high deference accorded to the state appellate court's analysis here, the state court's rejection of this claim was not contrary to, or an unreasonable application, or clearly established Supreme Court law.  28 U.S.C. § 2254(d).

### C.   Admission of evidence

Petitioner claims that the introduction of "inflammatory letters" written by his co-defendant in their joint trial, combined with gang evidence and the prosecutor's argument, resulted in "gross unfairness" and prevented the jury from making a reliable determination of guilt.

The California Court of Appeal summarized the challenged evidence and rejected Petitioner's claim:

> The first letter stated in part, "Rosalda, . . . [w]hen you get a chance take your digital camera and go to . . . [an address on] Sarah Way in Suisun City and take photos of that house, cars and license plates of all the cars there.  Go to the library and look on a map to find this Calle Sarah Way.  This house is where one of the victims and his familia stays so be extra careful.  As for that putah . . . Vidrio do your best to obtain the address from Jessica cause you said one of Jessica's friends was speaking about that female a couple of weeks ago.  Phone number or address we really need the address though so do your best to get it. . . ."

> The second letter stated in part: "My dearest brownie, . . . [w]henever you feel better and you recover full strength I need you to start going to the grocery outlet on Travis.  Look for a female named [Vidrio].  She's raza, about [18] or [19] years old.  If and when you find her, don't say anything to her.  I just need to know if [s]he still works there.  And what she looks like.  And whatever other info you can get on her.  This is the bitch . . . that is involved in my case.  The same one who wants that money.  I rather have the bitch killed.  Serio. . . .  Those two straps from mugs . . . are very important to get.  And keeping note on how much Sleepy is supposed to be putting on my books.  That's if it ever gets to that level. . . .  Love always . . . Dennis."

> At the close of trial the jury was instructed, "Certain evidence, specifically the letters allegedly sent to and from . . . Derrick, were admitted only against . . . Derrick.  You must not consider that evidence against . . . Miranda."  The court also instructed:  "If you conclude that . . . Derrick tried to hide evidence, or discourage someone from testifying, you may consider that conduct only against that defendant.  You may not consider that conduct in deciding

whether . . . Miranda is guilty or not guilty.”

In her discussion of the “relevant evidence” during closing argument, the prosecutor stated, “Also the letters written by . . . Derrick.  You haven't had an opportunity to see those, but they are in evidence.  You will have them in the jury room.  In those letters he directs his wife to conduct surveillance on the home of . . . Clay on Sarah Way in Suisun.  You heard that’s where he lived at the time of this offense.  He directs her to conduct surveillance on . . . Vidrio, to go to her employment.  ‘Don’t talk to her, just find out what she looks like.  As much information as you can get about her.  Get her address if you can.’ [¶]  He goes on to explain how he wants to pay her off, or in the alternative, he would rather have her killed because he considers her to be the star witness in this case because she is so confident in her identifications.  She remembered as soon as she saw . . . Miranda she knew him.  She had seen him before.  And as soon as she got in there, she told the police, ‘I can identify him.’  And she did.  She told you, ‘I’m really positive it’s him.”

In his motion for new trial Miranda asserted the court erroneously denied his severance motion because he was prejudiced by Derrick’s letters and by the evidence that Derrick was older, had prison experience, and was a longstanding member of the Sureños.  In denying the motion, the court stated it believed the jury followed its instruction not to consider the letters against Miranda.

Miranda argues the letters were “extremely inflammatory,” suggesting that his codefendant was attempting to engage in witness intimidation or have witnesses killed.  He argues that the prosecutor’s argument suggested that Vidrio’s identification of Miranda was the motive for Derrick’s threatening letters, resulting in Miranda’s unfair “guilt by association.”  Miranda also relies on our Supreme Court’s recent statement in People v. Letner and Tobin (2010) 50 Cal. 4th 99, 152:  “A prejudicial association justifying severance will involve circumstances in which the evidence regarding one defendant might make it likely the jury would convict that defendant of the charges and, further, more likely find a codefendant guilty based upon the relationship between the two rather than upon the evidence separately implicating the codefendant.  (See People v. Chambers (1964) 231 Cal. App. 2d 23, 29 [concluding that the defendant ‘was probably fastened with vicarious responsibility for the long-continued brutality of [the codefendant],’ and that the jury likely convicted the defendant based upon a ‘notion of joint moral responsibility’ rather than personal guilt]; [citations].).”  He argues that Derrick’s letters would not have been admitted at a separate trial against Miranda and, despite the court’s instructions, the jury could not reasonably be expected to disregard the letters as to Miranda.

We conclude Miranda’s assertion that the joint trial was grossly unfair due to the admission of Derrick’s letters lacks merit.  The letters did not mention Miranda and the jury was instructed that it could not consider Derrick’s letters and evidence that Derrick tried to hide evidence or discourage someone from testifying against Miranda.  The jury is presumed to have followed the court’s

1
2
3

instructions.  (People v. Hovarter (2008) 44 Cal. 4th 983, 1005.)  To the extent the prosecutor encouraged the jury to consider the evidence against Miranda, we presume the jury also followed the court's CALCRIM No. 200 instruction, which provided in part: "If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."

4
5
6
7
8
9

Miranda also appears to argue that the extensive evidence regarding Derrick's gang association presented in the joint trial was grossly unfair to Miranda.  We again reject Miranda's claim of gross unfairness.  The court expressly instructed the jury pursuant to CALCRIM No. 203, "You must separately consider the evidence as it applies to each defendant.  You must decide each charge for each defendant separately."  Moreover, in his pretrial motion to sever, Miranda conceded he had been associated with a gang.  At trial, the gang expert testified that Miranda and Derrick were each members of CSM at the time of the shooting.

10

Miranda has failed to demonstrate that his joint trial with Derrick resulted in gross unfairness to him.

11

(Ans. Ex. G at 14-17.)

12
13
14
15
16
17

A joinder of co-defendants or counts may prejudice a defendant sufficiently to render his trial fundamentally unfair in violation of due process.  Grisby v. Blodgett, 130 F.3d 365, 370 (9th Cir. 1997).  A federal court's inquiry is limited to the petitioner's right to a fair trial under the United States Constitution.  Id.  To prevail, therefore, the petitioner must demonstrate that the state court's joinder resulted in prejudice great enough to render his trial fundamentally unfair.  Id.  In

18
19
20

addition, the impermissible joinder must have had a substantial and injurious effect or influence in determining the jury's verdict.  Sandoval v. Calderon, 241 F.3d 765, 772 (9th Cir. 2000).

21
22
23
24
25
26
27
28

Petitioner has not shown that he suffered prejudice or that he received a fundamentally unfair trial in violation of due process.  The trial court's limiting instructions clarified to the jury that Derrick's letters should be attributable only to Derrick.  See Bean v. Calderon, 163 F.3d 1073, 1085-86 (9th Cir. 1998) (recognizing that joinder generally does not result in prejudice if the jury is properly instructed so that it may compartmentalize the evidence).  Jurors are presumed to follow the court's instructions.  See Richardson v. Marsh, 481 U.S. 200, 206 (1987).

United States District Court
For the Northern District of California

On this record, there is no indication that the jury misapplied the evidence, and this claim is denied.

## CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that the Petition for a Writ of Habeas Corpus must be **DENIED**.

Further, a Certificate of Appealability is **DENIED**.  <u>See</u> Rule 11(a) of the Rules Governing Section 2254 Cases.  Petitioner has not made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

The Clerk shall terminate any pending motions, enter judgment in favor of Respondent, and close the file.

DATED:  _____4/29/2013_____



EDWARD J. DAVILA
United States District Judge

United States District Court

For the Northern District of California

17

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

SERGIO MARCOS MIRANDA,

        Plaintiff,

  v.

TIM VIRGA et al,

        Defendant.
_____/

Case Number: CV12-02483 EJD

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on ____4/30/2013_____, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Sergio Marcos Miranda AA-4895
California State Prison
P. O. Box 290066
Represa, CA 95671

Dated: _____4/30/2013_____

Richard W. Wieking, Clerk
/S/By: Elizabeth Garcia, Deputy Clerk

**United States District Court**
For the Northern District of California